IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MIDWEST INSTITUTE OF HEALTH, PLLC,
d/b/a GRAND HEALTH PARTNERS,
WELLSTON MEDICAL CENTER, PLLC,
PRIMARY HEALTH SERVICES, PC, AND
JEFFERY GULICK

              Plaintiffs,                  Case No. 1:20-cv-414

vs.

GRETCHEN WHITMER, in her official      Hon.
capacity as Governor of the State of Michigan,
DANA NESSEL, in her official capacity as
Attorney General of the State of Michigan,
and ROBERT GORDON, in his official
capacity as Director of the Michigan
Department of Health and Human Services,

              Defendants.

---

James R. Peterson (P43102)
Stephen J. van Stempvoort (P79828)
Amy E. Murphy (P82369)
MILLER JOHNSON
Co-counsel for Plaintiffs
45 Ottawa Avenue SW, Suite 1100
Grand Rapids, Michigan 49503
(616) 831-1700
petersonj@millerjohnson.com
vanstempvoorts@millerjohnson.com
murphya@millerjohnson.com

Patrick J. Wright (P54052)
Mackinac Center Legal Foundation
140 W Main St.
Midland, Michigan 48640-5156
Co-counsel for Plaintiffs
(989) 631-0900
wright@mackinac.org

---

## VERIFIED COMPLAINT

      The Plaintiffs comprise medical providers and a patient seeking vital medical

services during this re-declared state of emergency.  They file this Complaint for declaratory

1

judgment, injunctive relief, damages, and other relief to vindicate their rights under the United States and Michigan Constitutions and to preserve their ability to safely provide and obtain necessary healthcare services as Michigan citizens, as detailed below:

1.      The COVID-19 pandemic and its initial spread in the United States and Michigan represented an extraordinary challenge for the citizens of Michigan and its elected representatives.  Initial projections based on some models projected widespread infection of the population that would overwhelm our hospitals and healthcare systems, resulting in a massive number of deaths.  One model from the CDC projected between 160 to 214 million infections and between 200,000 to 1.7 million deaths nationwide.[1]  Such projections and the lack of available data on U.S. cases put governmental leaders in very difficult spots.  Nonetheless, based upon those projections, government leaders made hard decisions on how to best to protect the health of their citizens, while acting within the bounds of controlling constitutions and established law.

2.      Fortunately, however, the projections upon which the government leaders made their decisions back in March 2020 were grossly inaccurate.  Set forth below is a comparison of the projections made by the CDC in early 2020 with the actual data as of May 10, 2020.

| Data | CDC Projections | Actual Numbers[2] | Comparison of Actual Numbers to CDC Projections |
|---|---|---|---|
| Number of people infected nationwide | 160 million to 214 million | 1,324,488 | 0.8% to 0.6% of projection |
| Number of deaths nationwide | 200,000 to 1.7 million | 79,756 | 39.9% to 4.7% of projection |

---

[1] Chas Danner, *CDC's Worst-Case Coronavirus Model: 214 Million Infected, 1.7 Million Dead*, N.Y. Magazine Intelligencer, updated Mar. 13, 2020, available at https://nymag.com/intelligencer/2020/03/cdcs-worst-case-coronavirus-model-210m-infected-1-7m-dead.html.
[2] https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html  (last updated May 11, 2020; last visited May 12, 2020).

3.     Many decisions made in immediate response to protect against the COVID-19 threat and the dire, potential public health crisis resulted in severe restrictions on the rights and liberties of both private individuals and businesses.  Michigan was no exception.

4.     Since early March 2020, Michigan Governor Gretchen Whitmer has taken drastic, unprecedented, unilateral executive actions in an effort to address the spread of the virus that causes COVID-19—declaring a state of emergency in the State of Michigan and justifying her restriction on rights and liberties based on the very important goal to "flatten the curve" and avoid overwhelming Michigan's healthcare system and hospitals.

5.     Thankfully, the goal of flattening the curve has been achieved, and the dire predictions of overwhelmed hospitals have not come to pass.

6.     During a press conference on Monday, April 27, 2020, Governor Whitmer acknowledged that the curve has flattened in Michigan.  Graphics depicted that while Governor Whitmer's administration anticipated 220,000 patients being hospitalized without social distancing efforts, there had only been 3,000 hospitalizations as of April 27.   That is less than 1.4% of the projected COVID-19 hospitalizations underlying the Governor's declared states of emergency and disaster.

7.     According to data released by the State of Michigan, hospitals in the state are well-stocked with over 2,400 available ventilators, nearly 1,000 available ICU beds, and more than 7,000 available hospital beds.[3]

---

[3]   https://www.michigan.gov/coronavirus/0,9753,7-406-98159-523641--,00.html  (last   updated May 11, 2020; last visited May 12, 2020).

8.      On May 7, 2020, Governor Whitmer announced a six-phase plan to reopen Michigan's economy titled "MI Safe Start."  Governor Whitmer stated that Michigan was in the third phase, called the "Flattening" phase, in which "[c]ase growth is gradually declining."[4]

9.      But even in the Flattening phase, the reopening of the economy is strictly limited to only "[s]pecified lower-risk businesses with strict workplace safety measures."  Only in later phases does the Governor's plan permit the retail sector, offices, restaurants, and bars to reopen.  And the Governor has not indicated when medical services deemed "non-essential" by her executive order will be permitted to resume.

10.      In the Governor's view, Michigan will not reach the sixth "Post-pandemic" phase anytime soon.  From the Governor's perspective, Michigan enters that phase only once the state has achieved "sufficient community immunity" and there is "high uptake of an effective therapy or vaccine."  The mumps vaccine holds the record for the fastest ever approved vaccine— with development and approval in 4 years.[5]

11.      Governor Whitmer's MI Safe Start Plan warns that at any time, "it is also possible to move backwards"—and reenter earlier phases of the emergency—"if risk increases and if we stop adhering to safe practices."  There is a real possibility that Governor Whitmer continues for many months, if not years, to enact measures that burden the rights and liberties of individuals and businesses without legislative input.  Michigan is under an unlawfully re-declared state of emergency, with the Executive Branch dictating the law, and there is no end in sight.

---

[4] MI Safe Start: A Plan to Re-Engage Michigan's Economy, Gov. Gretchen Whitmer, available at https://content.govdelivery.com/attachments/MIEOG/2020/05/07/file_attachments/1446147/Governor%20Whitmer%27s%20MI%20Safe%20Start%20Plan.pdf (published May 7, 2020; last visited May 12, 2020).

[5] Donald G. McNeil, Jr., *The Coronavirus in America: The Year Ahead*, New York Times, April 18, 2020, available at https://www.nytimes.com/2020/04/18/health/coronavirus-america-future.html.

12.     Meanwhile, medical providers are on the brink of financial ruin, facing extreme revenue shortages caused by the Governor's order forcing the postponement or cancellation of so-called "non-essential" procedures.  Thousands of healthcare workers across Michigan have been furloughed or laid off.

13.     The Michigan Legislature permitted Governor Whitmer to take extraordinary and immediate executive action during the first month of Michigan's response to the pandemic and even granted a 23-day extension.  But the Michigan Legislature declined to extend Governor Whitmer's declaration of a state of emergency beyond April 30, 2020. The Legislature's decision not to extend the state of emergency constituted its determination that, now that Michigan had its bearings about the nature of the pandemic, the Legislature could resume its constitutionally mandated role of legislating based upon policy for what is no longer an emergency but a long-term challenge.

14.     But instead of permitting the Legislature to resume its ordinary policy-setting and law-making role, Governor Whitmer simply re-declared exactly the same state of emergency that Michigan law required, and the Legislature directed, to be terminated. Under Governor Whitmer's interpretation of the relevant statutes, she may continue to re-declare a state of emergency serially, for as long as she determines that the pandemic continues to constitute an "emergency."

15.     No one disputes that the exercise of executive power may be necessary in some time-limited, emergency situations. But the Governor's sweeping assertion that she can rule by emergency powers, potentially for years and without any regard for the Legislature, exceeds the scope of her statutory authority and violates the safeguard of the Michigan Constitution's Separation of Powers clause. This is an extraordinarily dangerous precedent to set. "While the law

may take periodic naps during a pandemic, we will not let it sleep through one." *Maryville Baptist Church, Inc. v. Beshear*, __ F.3d __, 2020 WL 2111316, at *4 (6th Cir. May 2, 2020).

16.     The Governor's executive orders—including Executive Orders 2020-17 and 2020-77, which prohibit all "non-essential" medical treatments and expansive categories of in-person work, respectively—are predicated upon Governor Whitmer's improper attempts to re-declare a state of emergency that has already been terminated. They therefore cannot be applied to the Plaintiffs.

17.     And even if it was appropriate for the Governor to re-declare over the Legislature's objection exactly the same state of emergency that had just been terminated, the executive orders cannot constitutionally be applied to the Plaintiffs for many other reasons. As applied to the Plaintiffs, the executive orders are unconstitutionally vague; they violate procedural and substantive due process; and they violate the dormant commerce clause.

18.     The Plaintiffs are suffering immeasurable and irreparable harm from the Governor's executive orders. Plaintiffs who are healthcare providers are unable to provide preventive medical care to their patients.  Patients, one of whom is also a Plaintiff in this action, are unable to receive the care they need.  This has led to widely documented instances of patients whose conditions become drastically worse while they wait for care that is vital to their health yet deemed "non-essential" by Governor Whitmer.  Plaintiffs who are healthcare providers are also facing dire financial outlooks that could very well spell disaster for—and permanent shuttering of—their businesses.  At minimum, Plaintiffs will suffer irreparable harm in the form of lost business goodwill within the community and with the patients they serve, particularly if they are perceived as engaging in conduct that Executive Orders 2020-17 and 2020-77 have deemed to be

criminal in nature.  They will also suffer irreparable harm through the deprivation of their constitutional rights.  Preliminary and permanent injunctive relief is necessary in this case.

## Jurisdictional Allegations

19.     Plaintiff Midwest Institute of Health, PLLC, d/b/a Grand Health Partners ("Grand Health"), is a Michigan limited liability company with its principal place of business located at 2060 East Paris Ave., SE, Suite 100, Grand Rapids, MI 49546.

20.     Plaintiff Wellston Medical Center, PLLC ("Wellston Medical Center") is a primary care center located at 14477 Caberfae Hwy Wellston, Michigan 49689.

21.     Plaintiff Primary Health Services, PC ("Primary Health Services") is a primary care center located at 505 W Ludington Ave, Ludington, MI 49431.

22.     Plaintiff Jeffery Gulick is a resident of Owosso, Michigan, who was scheduled to undergo knee replacement surgery on March 20, 2020.

23.     Defendant Gretchen Whitmer is the Governor of Michigan and has issued more than 70 Executive Orders during the declared and re-declared emergency, including Executive Orders 2020-17 and 2020-77 that are at issue in this Complaint.  She is being sued in her official capacity.

24.     Defendant Dana Nessel is the Attorney General of Michigan and has authority to enforce Michigan law. She is being sued in her official capacity.

25.     Defendant Robert Gordon is the Director of the Michigan Department of Health and Human Services.  He is being sued in his official capacity.

26.     The Court has original jurisdiction over this civil rights case under 28 U.S.C. § 1331, 42 U.S.C. § 1983 and 28 U.S.C. § 1343. The Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367.

27.     This Court has authority to award the requested injunctive relief under 28 U.S.C. § 1343 and Federal Rule of Civil Procedure 65, the requested declaratory relief under 28 U.S.C. § 2201-02 and Federal Rule of Civil Procedure 57, and damages and attorneys' fees under 28 U.S.C. § 1343, 42 U.S.C § 1983 and 42 U.S.C. § 1988.

28.     Venue in this district is proper because a substantial part of the events or omissions giving rise to the claim occurred in this district, *see* 28 U.S.C. § 1391(b)(2).

**General Allegations**

**The Provider Plaintiffs Can Conduct Their Business Operations Safely**

29.     Plaintiffs Grand Health, Wellston Medical Center, and Primary Health Services (together, the "Provider Plaintiffs") in this action recognize that the safety of their employees and patients is and remains a paramount concern, and that additional steps to protect against the spread of the virus that causes COVID-19 should be taken by each employer consistent with CDC guidance. Each of the Provider Plaintiffs has already implemented procedures and precautions to ensure that it can safely operate in Michigan during the COVID-19 pandemic.

30.     Grand Health was established in 2008 and operates out offices in Grand Rapids, Petoskey, and Grand Haven, Michigan. Its medical staff—which currently consists of eight licensed medical doctors and a full staff of physicians' assistants, dieticians, exercise physiologists, and behaviorists—provides a full complement of surgical and non-surgical weight loss solutions for patients. Grand Health's physicians provide not only bariatric surgery services but also general surgery services, including laparoscopic cholecystectomy (gallbladder removal), appendectomy, and various types of hernia surgery and repair. Grand Health also provides endoscopic and colonoscopy services. All endoscopy services and pre- and post-operative care and medical programs take place at Grand Health's offices, but all surgeries occur at area hospitals, at which Grand Health's physicians have admitting privileges.

31.     Grand Health and its patients have been enormously impacted by Governor Whitmer's prohibition against the provision of bariatric and "non-essential" medical services since March 21, 2020. Obesity is one of the highest risk factors for morbidity, and timely preventive care is vital for many of Grand Health's patients. Many of Grand Health's weight-loss patients are lower income individuals, many of whom require surgery as a prerequisite for joint replacement surgery. The delay imposed by the prohibition of bariatric surgery has caused these individuals to suffer agonizing pain in the interim. Grand Health physicians have also seen an increase in cases where patients have been unable to obtain medical care until their condition has progressed far beyond a state in which it would have been easily treatable. For example, patients are obtaining surgery only after their gallbladder is gangrenous or their appendix is ruptured, instead of obtaining care when their condition was in a much less severe state. Although Grand Health continued to provide minimal levels of emergent care to its patients, Grand Health furloughed most of its employees and has pushed back almost all of its patients' procedures and post-operative support meetings. If the shutdown continues, Grand Health will almost certainly go out of business, and its medical staff will be out of work.

32.     If permitted to fully reopen, there is no question that Grand Health can conduct its operations in a manner that will take precautions to prevent the transmission of the virus that causes COVID-19. All surgeries will occur at a hospital, consistent with surgical sanitation and COVID-19-compliant guidelines. Grand Health has implemented a plan under which its health care providers will screen all patients and staff when they come in, taking temperature and pulse oximeter readings. Most patients will wait in their car instead of in the waiting room; for those who cannot do so, Grand Health's waiting room has been reduced to half-occupancy, thereby allowing for social distancing. Finally, staff in Grand Health's endoscopy

center will wear medical facemasks, including N95 respirator masks during any medical procedure, and will use half of the available surgical bays in order to ensure appropriate distance between medical teams.

33.     Wellston Medical Center and Primary Health Services are primary care clinics in West Michigan.  They serve patients in primarily rural communities surrounding Wellston and Ludington.  Over 90% of their patients are on Medicaid or Medicare.  Much of the medical care they provide is not emergency care, but it is extremely important.  For example, one patient had a stent in his ureter as a result of a kidney stone.  The stent was supposed to be removed in two weeks.  That procedure could not be scheduled for two months, resulting in a bladder and kidney infection.  The infection required hospitalization and emergency surgery.

34.     These clinics have been devastated by the Governor's executive orders.  Prior to March 2020, these clinics treated an average of 90-100 patients per day, with 16 staff members.  Under the Governor's executive orders, the clinics cannot perform what the Governor deems "non-essential procedures" meaning a medical or dental procedure that is not necessary to address a medical emergency or to preserve the health and safety of a patient, as determined by a licensed medical provider.  When Executive Order 2020-17 was issued, the number of patients who were allowed to be treated dropped by 95%.  If the shutdown continues, these clinics will almost certainly go out of business, and their medical staff will be out of work.

35.     Plaintiff Jeffery Gulick was scheduled to undergo knee replacement surgery on his right knee on March 20, 2020, at Memorial Hospital in Owosso.  Under the Governor's executive orders, his knee replacement surgery cannot go forward.  Additionally, he could not receive follow up care for the knee replacement surgery that had been performed on his left knee.

He is in excruciating pain and unable to get prescription pain medication until he can be seen on June 11.  As a result of the debilitating pain, Mr. Gulick has had to reduce his work hours by 80%.

36.     If permitted to reopen, there is no question that Wellston Medical Center and Primary Health Services can conduct their operations in a manner that will take precautions to prevent the transmission of the virus that causes COVID-19. All treatment will occur in a manner that is consistent with appropriate sanitation and COVID-19-compliant guidelines. Patients and staff will be screened for signs of COVID-19 and contact with those with COVID-19.  No more than two patients per hour will be scheduled.  Finally, staff and patients will wear facemasks, and the reception area will be equipped with a clear barrier.

**Governor Whitmer Issues Executive Orders Declaring a State of Emergency**

37.     On March 11, 2020, Governor Whitmer issued Executive Order 2020-04, which proclaimed a state of emergency under both the Emergency Management Act, Mich. Comp. Laws § 30.403, and the Emergency Powers of the Governor Act of 1945, Mich. Comp. Laws § 10.31.  (**Exhibit 1**).

38.     Governor Whitmer's executive order identified the COVID-19 pandemic as the basis for her declaration of a state of emergency under both statutory regimes.

39.     The Emergency Powers of the Governor Act provides that all orders and rules promulgated by the governor during the state of emergency "shall cease to be in effect upon declaration by the governor that the emergency no longer exists." Mich. Comp. Laws § 10.31(2).

40.     The Emergency Management Act provides that a governor's declaration of emergency may last only 28 days, after which "the governor shall issue an executive order or proclamation declaring the state of emergency terminated, unless a request by the governor for an

11

extension of the state of emergency for a specific number of days is approved by resolution of both houses of the legislature." Mich. Comp. Laws § 30.403(4).

41.     On April 1, 2020, Governor Whitmer issued Executive Order 2020-33, which replaced Executive Order 2020-04, declared a state of emergency pursuant to the Emergency Powers of the Governor Act, and proclaimed a state of disaster and a state of emergency under the Emergency Management Act. (**Exhibit 2**). These declarations were based on the same circumstances—that is, the dangers posed by the virus that causes COVID-19—that formed the basis of Executive Order 2020-04.

42.     On April 1, 2020, Governor Whitmer also requested that the Michigan Legislature extend the state of emergency by an additional 70 days, as contemplated by the Emergency Management Act.

43.     On April 7, 2020, the Michigan Senate and Michigan House of Representatives denied Governor Whitmer's request to extend the state of emergency for an additional 70 days. Instead, the Michigan Legislature extended the state of emergency declared by Governor Whitmer until April 30, 2020, but not beyond.

**Governor Whitmer Issues Numerous Executive Orders, Including an Order That Prohibits the Provision of All Non-Emergency Medical Care**

44.     Meanwhile, Governor Whitmer issued many additional executive orders, invoking emergency powers that the Governor claims flow from the state of emergency declared under Executive Orders 2020-04 and 2020-33. As of May 8, 2020, Governor Whitmer had issued more than 70 executive orders related to the COVID-19 pandemic, creating and changing substantive state law and regulations that impact and burden wide swaths of the economy. A chart

summarizing the substantive changes to the law imposed by Governor Whitmer's executive orders is attached as **Exhibit 3**.[6]

45.     One of these orders, Executive Order 2020-17, took effect on March 21, 2020 and remains in effect until the termination of the Governor's declaration of emergency. It provides that, until the termination of the Governor's declaration of a state of emergency, most medical providers are prohibited from providing any "medical or dental procedure that is not necessary to address a medical emergency or to preserve the health and safety of a patient, as determined by a licensed medical provider." (**Exhibit 4**).

46.     Executive Order 2020-17 specifically prohibits medical providers from providing any bariatric surgery and joint replacement surgery services, "except for emergency or trauma-related surgery where postponement would significantly impact the health, safety, and welfare of the patient."

47.     There are significant penalties for health care providers who violate the executive order. Executive Order 2020-17 provides that any willful violation of its provisions is a misdemeanor.

48.     On May 3, 2020, Dr. Joneigh Khaldun, Chief Deputy Director Health at the Michigan Department of Health and Human Services, issued a general letter to Michigan health care providers, noting, "I recognize some have questions about Executive Order 2020-17, including what is allowable under the order and how to start to re-engage with patients for important care." Dr. Khaldun then provided her own interpretation of the language of Executive Order 2020-17 prohibiting non-essential medical care: "This wording is intended to be flexible, preserve clinician judgement, and encourage consideration on an individual basis of which patient

---

[6] The chart attached as Exhibit 3 was last updated as of 5 p.m. Eastern Time on May 11, 2020.

services can be safely delayed without resulting in a significant decline in health. **EO 2020-17 gives providers broad discretion to apply this standard**." (**Exhibit 5**).

49.     It is not clear that Dr. Khaldun's interpretation of the Executive Order has any weight. Further, regardless of Dr. Kaldun's correspondence, Executive Order 2020-17 continues to prohibit bariatric and joint replacement surgeries and continues to impose criminal penalties for those who willfully violate the order.

**Governor Whitmer Issues Several Stay-at-Home Orders Prohibiting Most In-Person Business Operations**

50.     Along with her other executive orders, Governor Whitmer issued at least five iterations of "Stay Home, Stay Safe" orders, specifically Executive Orders 2020-21, 2020-42, 2020-59, 2020-70, and 2020-77. Each of those orders imposes sweeping limitations on Michigan citizens' ability to travel and prohibits huge numbers of workers in Michigan from reporting to work.

51.     On March 23, 2020, Governor Whitmer issued Executive Order 2020-21, citing as authority the Emergency Management Act and the Emergency Powers of the Governor Act.  (**Exhibit 6**).

52.     Executive Order 2020-21 went into effect on March 24, 2020. Among other restrictions, Executive Order 2020-21 restricts travel throughout the state and prohibits business operations "that require workers to leave their homes or places of residence" unless those workers are "critical infrastructure workers." (Exhibit 6, ¶ 4(a)). "Critical infrastructure workers" are defined as "those workers described" in a March 19, 2020 memorandum prepared by the Department of Homeland Security's Cybersecurity and Infrastructure Security Agency (the "March 19 CISA guidance"), along with a short list of other workers. (*Id*. ¶ 8). The March 19

14

CISA guidance is attached as **Exhibit 7**.  Executive Order 2020-21 imposes criminal penalties for willful violations of the order.  (Exhibit 6, ¶ 17).

53.     On April 9, 2020, Governor Whitmer issued Executive Order 2020-42, attached as **Exhibit 8**, rescinding and replacing her previous stay-at-home order and extending the shutdown until April 30, 2020. Like the previous executive order, Executive Order 2020-42 prohibits in-person work by workers who are not "critical infrastructure workers" and imposes criminal penalties for willful violations of the order. (Exhibit 8, ¶¶ 4, 17).

54.     Executive Order 2020-42 imposes significant restrictions that curtail basic liberties to a greater extent than were imposed by any other shutdown order issued by any other state. For example, under Executive Order 2020-42 large retail stores are prohibited from advertising almost all of their products and are also prohibited from selling products that are deemed nonessential, including materials related to the construction industry, such as paint, carpet, and flooring. Executive Order 2020-42 does not explain the rationale for prohibiting the purchase of these items, nor does it indicate how the prohibition of their sale was related to abating the emergency posed by COVID-19.

55.     On April 24, 2020, Governor Whitmer issued Executive Order 2020-59, which became effective immediately and rescinded Executive Order 2020-42.  (**Exhibit 9**).

56.     Executive Order 2020-59 lifts certain business restrictions, permitting workers who are necessary to perform certain defined "resumed activities" to perform in-person work.  Those "resumed activities" are defined as: (a) workers who process or fulfill remote orders for goods for delivery or curbside pickup; (b) workers who perform bicycle maintenance or repair; (c) workers for garden stores, nurseries, and lawn care, pest control, and landscaping operations; (d) maintenance workers and groundskeepers for places of outdoor recreation; and (e) workers for

15

moving or storage operations. Businesses whose workers perform some "resumed activities" must implement enhanced social-distancing rules and measures listed in Sections 11(h) and 12 of Executive Order 2020-59. As with all of the other Stay Home, Stay Safe orders, a willful violation of Executive Order 2020-59 is a criminal misdemeanor.

57.     On May 1, 2020, Governor Whitmer issued another update to the Stay Home, Stay Safe order, Executive Order 2020-70, which became effective immediately and rescinded Executive Order 2020-59.  (**Exhibit 10**).

58.     Executive Order 2020-70 continues the restrictions of the previous Stay Home, Stay Safe orders, but lifts restrictions on additional "resumed activities," including workers in the construction industry and the building trades, workers in the real-estate industry, workers necessary to the manufacture of goods that support workplace modification to forestall the spread of COVID-19 infections, and outdoor workers.  In addition to the list of enhanced social-distancing rules and measures applicable to all resumed activities, construction businesses must implement other stringent measures listed in Section 11(i) of Executive Order 2020-70.

59.     On May 7, 2020, Governor Whitmer issued Executive Order 2020-77, which became effective immediately and rescinded Executive Order 2020-70.  This order continues the restrictions of the previous Stay Home, Stay Safe orders, but permits manufacturing workers to resume operations, subject to yet another set of stringent, enhanced workplace safety requirements listed in Section 11(k) of Executive Order 2020-77. (**Exhibit 11**).  This is the controlling stay-at-home order as of the date of the filing of this complaint.  As with all of the other Stay Home, Stay Safe orders, a willful violation of Executive Order 2020-77 is a criminal misdemeanor.

**Governor Whitmer's Executive Orders Cause Enormous and Immediate Confusion**

60.     Almost immediately after her first shelter-in-place order (Executive Order 2020-21) was issued, the Attorney General and Governor were inundated with requests for clarification of the order. On March 24, 2020, Governor Whitmer observed, "We knew that there would be confusion, there always is."[7]

61.     On March 25, the Attorney General's office admitted, "I think it's a difficult executive order to really wrap your arms around."[8] The Attorney General's office explained that its process of clarifying the meaning of the order occurred on an ad hoc, case-by-case basis: "Every instance we get a call asking about whether or not businesses essential is being first reviewed by our office and then shared with the governor's office so that we can begin to get some clarity around the executive order."

62.     Meanwhile, the portion of Attorney General Nessel's official website that provides guidance to businesses and law enforcement regarding the definition of "critical infrastructure workers" has linked to the updated CISA guidance, instead of to the March 19 CISA Guidance.  (**Exhibit 12**). As a result, a business seeking guidance from the Attorney General's office as to whether it performs "critical infrastructure" operations is directed to the updated CISA guidance that Executive Orders 2020-42, 2020-59, 2020-70, and 2020-77 explicitly reject.

---

[7] Mikenzie Frost, *Gov. Whitmer says she understands confusion surrounding stay-at-home, urging patience*, WWMT, Mar. 24, 2020, available at https://wwmt.com/news/state/gov-whitmer-says-she-understands-confusion-surrounding-stay-at-home-urging-patience (last visited May 12, 2020).

[8] Malachi Barrett, *Michigan Attorney General asks local law enforcement to handle violations of coronavirus stay home order*, MLive, Mar. 25, 2020, available at https://www.mlive.com/public-interest/2020/03/michigan-attorney-general-asks-local-law-enforcement-to-handle-violations-of-coronavirus-stay-home-order.html (last visited May 12, 2020).

63.    Despite the admitted confusion created by the orders, the Attorney General's office reiterated that violating the order could result in criminal penalties and forced closure of a business by law enforcement.[9]

**The MDHHS Issues an Order Purporting to Authorize Enforcement Action Against Violations of Executive Orders and FAQs That Did Not Yet Exist**

64.    Meanwhile, Robert Gordon, the Director of the Michigan Department of Health and Human Services ("HHS"), issued an emergency order on April 2, 2020 that purports to impose penalties based on the constantly changing FAQ answers that are posted on the Governor's website. (**Exhibit 13**).

65.    Specifically, the HHS order provides that "[t]he procedures and restrictions outlined in . . . EO 2020-21 and [its] accompanying frequently asked questions (FAQs) that may be updated from time-to-time (available at www.michigan.gov/coronavirus) are necessary to control the epidemic and protect the public health." (Exhibit 13, ¶ 1).

66.    The HHS order further provides that "[l]aw enforcement is specifically authorized to bar access to businesses and operations that fail to comply with the procedures and restrictions outlines in . . . EO 2020-21 and its accompanying FAQs." (Exhibit 13, ¶ 4). The HHS order applies "to any future Executive Order that may be issued that rescinds and replaces . . . EO 2020-21." (Exhibit 13, ¶ 4).

67.    As recognized in the HHS order, the FAQs accompanying Executive Order 2020-59 were updated and changed over time. In other words, the HHS order purports to determine that various executive orders and FAQ responses are "necessary to control the epidemic" even though some of the executive orders and FAQ responses were not yet in existence. It is impossible

---

[9] Virginia Gordan, *Local police to handle reports of violations of Gov. Whitmer's stay-at-home order*, Michigan Radio, Mar. 25, 2020, available at https://www.michiganradio.org/post/local-police-handle-reports-violations-gov-whitmers-stay-home-order (last visited May 12, 2020).

for HHS to have determined that future executive orders and FAQ responses were necessary when they did not yet exist and when HHS therefore did not know their substance or content.  It is also impossible for businesses to comply with constantly changing and sometimes conflicting FAQ responses.

**The Legislature Declines to Extend the Governor's Emergency Declaration, and the Governor Unilaterally Determines to Extend It Anyway**

68.     As indicated, the Emergency Management Act requires the Governor to declare that a state of emergency is terminated after 28 days if the legislature does not extend the emergency, and the Emergency Powers of the Governor Act states that any emergency declared under that statute terminates when the Governor declares that the emergency is terminated.

69.     On April 30, 2020, the Michigan Legislature refused to extend Governor Whitmer's declarations of a state of emergency and a state of disaster.

70.     Immediately after the Michigan Legislature refused to extend her emergency declarations, Governor Whitmer issued on April 30, 2020 three additional Executive Orders: 2020-66, 2020-67, and 2020-68.

71.     Executive Order 2020-66 terminates the Governor's declarations of a state of emergency and a state of disaster based upon the COVID-19 pandemic, as required under the Emergency Management Act. (**Exhibit 14**).

72.     Executive Order 2020-68 was issued only minutes after Executive Order 2020-66 was issued. Executive Order 2020-68 purports to re-declare under the Emergency Management Act exactly the same states of disaster and emergency that the Legislature refused to extend and which had just been terminated under Executive Order 2020-66. These renewed states of disaster and emergency purported to remain effective through May 28, 2020. (**Exhibit 15**).

73.     Executive Order 2020-67 states that a "state of emergency remains declared across Michigan" under the Emergency Powers of the Governor Act and that the state of emergency remains in effect until May 28, 2020. The state of emergency that Executive Order 2020-69 references is exactly the same state of emergency that the Governor declared to be terminated in Executive Order 2020-66. (**Exhibit 16**).

**The Governor Continues to Issue Revised Stay Home, Stay Safe Orders**

74.     After re-declaring a state of emergency notwithstanding the Legislature's refusal to extend it, Governor Whitmer continued to issue revised Stay Home, Stay Safe orders.

75.     On May 7, 2020, Governor Whitmer issued Executive Order 2020-77, continues the restrictions of the previous Stay Home, Stay Safe orders, with limited exceptions.

76.     Even though CISA updated its guidance twice—first on March 28 and again on April 17, 2020 (**Exhibits 17** & **18**)—Executive Order 2020-77 explicitly rejects both versions of the updated CISA guidance and continues to rely upon the March 19 CISA guidance for the definition of "critical infrastructure workers."  The Executive Order does not explain its rationale for continuing to rely upon superseded and outdated CISA guidance.

77.     By not adopting the most current CISA guidance, Executive Order 2020-77 relies on a different, more restrictive definition of "critical infrastructure workers" than the definition relied upon by other states, which creates confusion for businesses and their employees and needlessly restricts economic activity in the State of Michigan.

78.     Executive Order 2020-77 does not provide any process through which a company that is not designated as "critical infrastructure" may challenge that designation.

79.     A willful violation of Executive Order 2020-77 is a misdemeanor which could result in imprisonment for up to 90 days and a $500 fine.

80.    After the Legislature refused to extend the Governor's declaration of emergency past April 30, Attorney General Nessel issued a letter to law enforcement officials asserting that the Governor's executive orders—including her Stay Home, Stay Safe orders—continued to be valid under the Emergency Powers of the Governor Act and directing that law enforcement officials continue to enforce the Governor's orders. Notably, the Attorney General did not defend the Governor's assertion of authority to unilaterally extend the emergency under the Emergency Management Act. (**Exhibit 19**).

81.    Due to the harsh penalties imposed for violating Executive Order 2020-77 and the HHS order—including criminal penalties and potential revocations of necessary business licenses—the Plaintiffs are in a very difficult position.  Either they need to cease operations despite the fact that Executive Orders 2020-17 and 2020-77 may be invalid or may allow them to continue, or they need to continue operations under the threat of criminal prosecution and loss of their licenses.

82.    The Plaintiffs have suffered and will suffer immeasurable and irreparable harm if Executive Orders 2020-17 and 2020-77 are continued and/or enforced against them.  If the Provider Plaintiffs are prohibited from providing medical treatment, they will almost certainly become insolvent or be forced to permanently close their operations.  If Mr. Gulick is further delayed from obtaining knee replacement surgery, he will continue suffering unnecessary pain. At minimum, they will suffer irreparable harm in the form of lost business goodwill within the community and with their patients, particularly if they are perceived as engaging in conduct that Executive Order 2020-77 has deemed to be criminal in nature.

### Causes of Action

### Count I – Declaratory Judgment
### (Unlawful Exercise of Authority Under State Law)

83.     Plaintiffs incorporate all preceding allegations.

84.     Executive Order 2020-17 and Executive Order 2020-77 are unenforceable because the Governor lacked authority to issue them or renew them after April 30, 2020.

85.     In Executive Orders 2020-4 and 2020-33, Governor Whitmer proclaimed states of emergency and disaster based on COVID-19 and stated that those proclamations would terminate when the emergency conditions no longer exist "consistent with the legal authorities upon which this declaration is based and any limits on duration imposed by those authorities," including Section 3 of the Emergency Management Act, which limits the Governor's authority to declare disasters or emergencies to 28 days. *See* Mich. Comp. Laws § 30.403(3), (4).

86.     To support an executive order, both the Emergency Management Act, Mich. Comp. Laws § 30.403 and the Emergency Powers of the Governor Act, Mich. Comp. Laws § 10.31, require the continuation of the previously proclaimed states of emergency or disaster.

87.     The Emergency Powers of the Governor Act provides that all orders and rules promulgated by the governor during the state of emergency "shall cease to be in effect upon declaration by the governor that the emergency no longer exists." Mich. Comp. Laws § 10.31(2).

88.     The Emergency Management Act provides that a governor's declaration of emergency may last only 28 days, after which "the governor shall issue an executive order or proclamation declaring the state of emergency terminated, unless a request by the governor for an extension of the state of emergency for a specific number of days is approved by resolution of both houses of the legislature." Mich. Comp. Laws § 30.403(4) (emphasis added).

89.     In issuing Executive Order 2020-33, Governor Whitmer invoked only a single emergency—namely, the COVID-19 pandemic—as grounds for exercising her powers under the Emergency Management Act and the Emergency Powers of the Governor Act.

90.     The Michigan Legislature did not approve Governor Whitmer's request for an extension of the declaration of emergency beyond April 30, 2020.   Accordingly, as a matter of law, the state emergency must be terminated.   *See* Mich. Comp. Laws § 30.403.   Governor Whitmer terminated the state of emergency and disaster declaration supporting Executive Order 2020-77 on April 30, 2020 by issuing Executive Order 2020-66.

91.     That declaration terminated and ended any emergency declaration under the Emergency Powers of the Governor Act and all "orders, rules and regulations" promulgated by the Governor based on that emergency "cease to be in effect" and "no longer exist[]." *See* Mich. Comp. Laws § 10.31(2). Any other interpretation of the Emergency Powers of the Governor Act would not only render the Emergency Management Act entirely superfluous but would also violate the Separation of Powers Clause contained in Michigan's Constitution.

92.     Both houses of the Michigan Legislature have not approved an extension of emergency or disaster as declared by the Governor beyond April 30, 2020 and the state of emergency has been terminated by the Governor. Accordingly, Executive Orders 2020-17 and 2020-77 are unenforceable.

93.     After terminating the emergency underlying Executive Orders 2020-17 and 2020-77, Governor Whitmer issued an additional two Executive Orders on April 30, 2020, Nos. 2020-67 and 2020-68.   Those Orders purport to "continue a statewide emergency and disaster" under the Emergency Powers of the Governor Act and the Emergency Management Act and serve

as the basis to support the Governor's position that her executive orders predicated on the terminated state of emergency remain enforceable.

94.     The Orders constitute an attempt to undo and negate the termination of the state of emergency that the Governor was required to end as a matter of law.  They have no legal force or effect, and cannot void the termination of the state of emergency foundational to her other Executive Orders.   The Governor cannot terminate the emergency as required by law and "unterminate" it or declare it continued in the next breath without running afoul of the law upon which she relied to support her Executive Orders.

95.     There is no new emergency. The emergency upon which the Governor's subsequent executive orders rely is exactly the same emergency that Executive Order 2020-66 terminated. The Governor's attempts to circumvent state law cannot be sanctioned, because they not only violate the Separation of Powers clause in the Michigan Constitution, but would also render the statutory language requiring legislative permission for an extension of a proclaimed state of emergency beyond 28 days superfluous.  It is well-settled that statutes should be interpreted to be constitutional if such a construction is permitted by the language.

96.     The Governor cannot unilaterally extend the states of emergency or disaster in contravention of the state laws that she relies on to justify her executive orders, including Executive Orders 2020-17 and 2020-77. Any contrary interpretation would violate basic principles of separation of powers. It would unlawfully permit the Governor to declare as many emergencies as she wanted, for as long as she wanted, without any legislative checks on the Governor's law making by emergency executive order.

97.     Further, to the extent that Mich. Comp. Laws § 10.31 is the basis of the Governor's emergency declaration, it permits the Governor only to issue "reasonable" orders,

24

rules, and regulations. If applied to prohibit the Plaintiffs' operations, Executive Order 2020-17 and 2020-77 are unreasonable regulations and are not permitted by Mich. Comp. Laws § 10.31(1).

98.     The Plaintiffs have been informed by law enforcement and other officials that their operations are prohibited under Executive Orders 2020-17 and 77.

99.     Plaintiffs have no adequate remedy at law for this continuing unlawful action by the Defendants.

**Count II – Declaratory Judgment**
**(Violation of Separation of Powers and Non-Delegation Clauses)**
**Michigan Constitution, Art. III, § 2, and Art. IV, § 1**

100.     Plaintiffs incorporate all preceding allegations.

101.     Executive Orders 2020-17 and 2020-77 are unconstitutional and unenforceable against the Plaintiffs because they are based on impermissible delegations of legislative authority in violation of the Michigan Constitution.

102.     The Separation of Powers Clause in the Michigan Constitution provides that "[t]he powers of government are divided into three branches: legislative, executive, and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution."  Mich. Const. (1963) art. III, Section 2.

103.     Article IV, Section 1 of the Michigan Constitution prohibits the delegation of "legislative power."  The essential purpose of this prohibition is to "protect the public from misuses of delegated power." *Blue Cross and Blue Shield of Mich. v. Milliken*, 422 Mich. 1, 51 (1985).

104.     A delegation of power through legislation cannot be lawful if it permits executive law making. If a delegation of authority to the executive branch is not sufficiently

25

specific and/or fails to establish prescribed boundaries, or if the executive branch acts beyond specific boundaries in the legislation, the executive's actions will be constitutionally invalid.

105.    Executive Order 2020-17 and 2020-77 are unlawful and unenforceable because the Emergency Powers of the Governor Act, Mich. Comp. Laws § 10.31, violates the Separation of Powers and the non-delegation clauses to the extent that it is interpreted as a delegation to the Governor of total legislative power during a proclaimed emergency for an indefinite period of time.

106.    The Emergency Powers of the Governor Act provides no standards to guide or allow a proper delegation of legislative authority to the executive branch.  This delegation of authority is completely open-ended; it permits unbridled "law making" by the Governor. The statute has no temporal, durational, substantive, or legislative checks.  It gives the Governor carte blanche to regulate and restrict all manner of economic activity, all human interactions, and all movement within the state.  A summary of the impermissible law making conducted by Governor Whitmer through executive orders based on this purported grant of statutory authority is attached. (**Exhibit 3**).  Accordingly, Governor Whitmer's executive actions predicated on this Act are not enforceable.

107.    In the event that the Emergency Powers of the Governor Act does not facially violate the Separation of Powers and non-delegation clauses, Executive Orders 2020-17 and 2020-77 are unlawful and unenforceable because Governor Whitmer has applied any authority granted to her under the Emergency Powers of the Governor Act arbitrarily, unreasonably, and in violation of the Separation of Powers Clause.  The Governor has also failed to comport with the terms of the Act.

108.    Governor Whitmer explained in an interview on April 27, 2020 her view that "[w]e have to look at this [permitting Michigan businesses to resume operations] as a dial—not a switch, not on and off—but as a dial we can increase or decrease if necessary." Regulating how, when, and what economic activity will be permitted and which Michigan citizens may engage in their rights to earn a living over a lengthy period of time is a legislative function, not an executive one.

109.    Executive Order 2020-17 and 2020-77 are also unlawful and unenforceable because the Emergency Management Act, Mich. Comp. Laws § 30.403, violates the Separation of Powers and the non-delegation clauses by giving the Governor total legislative power during a unilaterally-determined emergency for up to 28 days and thereafter with legislative approval.

110.    The Emergency Management Act provides no standards to guide or allow a proper delegation of legislative authority to the executive branch; it permits unbridled "law making" by the Governor. This delegation of authority is completely unconstrained. It provides only a temporal check in requiring the Governor to terminate any declared emergency or disaster after 28 days unless both houses of the Michigan Legislature agree to extend the state of emergency or disaster. *See* Mich. Comp. Laws § 30.403(3) & (4). A summary of the impermissible law making conducted by Governor Whitmer through executive orders based on this purported grant of statutory authority is attached.  (**Exhibit 3**).

111.    Even if the Emergency Management Act does not facially violate the Separation of Powers and non-delegation clauses, Executive Orders 2020-17 and 2020-77 are also unlawful and unenforceable because Governor Whitmer has applied any authority granted to her under the Emergency Management Act arbitrarily, unreasonably, and in violation of the Separation of Power clause.  The Governor has also failed to comport with the terms of the Act.

112.     Plaintiffs have no adequate remedy at law for this continuing unlawful action by the Defendants.

**Count III – Violation of Due Process – Void for Vagueness**
**U.S. Constitution, Amendment XIV and 42 U.S.C. § 1983;**
**Michigan Constitution, Article I, § 17**

113.     Plaintiffs incorporate all preceding allegations.

114.     To the extent that Executive Order 2020-17 and 2020-77 are interpreted to bar the Plaintiffs' operations, the Executive Orders are unconstitutionally vague as applied to the Plaintiffs.

115.     A basic principle of due process is that an enactment is void for vagueness if its prohibitions are not clearly defined.   Executive Order 2020-17 and 2020-77 are unconstitutionally vague because they inappropriately chill protected conduct and invite selective enforcement.

116.     Executive Order 2020-17 does not give the Plaintiffs, or any other person of ordinary intelligence, a reasonable opportunity to know what is prohibited and to be able to act in accordance with the directives. The assessment of which medical treatments are deemed essential are largely left to the discretion of healthcare providers, but there are no standards or metrics by which healthcare providers can ensure that their decisions do not expose them to criminal liability.

117.     Dr. Khaldun's correspondence underscores that the language of Executive Order 2020-17 is subject to broad interpretation, further undermining the ability of Executive Order 2020-17 to provide reasonably precise guidance to healthcare providers. Due to the criminal penalties imposed by the executive order, these vagueness concerns are heightened.

118.    Executive Order 2020-77 does not give the Plaintiffs, or any other person of ordinary intelligence, a reasonable opportunity to know what is prohibited and to be able to act in accordance with the directives.  The executive order defines critical infrastructure workers as those "who are necessary to sustain or protect life," which "include *some* workers in each of" a number of business sectors.  § 4(a), § 8 (emphasis added).  Both facets of the definition are unclear.

119.    Executive Order 2020-77 does not provide any explicit standards for determining whether particular operations are or are not engaged in critical infrastructure activity. The executive order does not clarify why certain industries were declared to be critical infrastructure and others were not; instead, it simply references a superseded list provided by CISA, rejects the updated version of the CISA guidance, and adds a handful of other workers deemed critical, such as insurance industry workers, labor union officials, landscapers, and real estate sales workers. The rationale for these decisions—including the decision to allow real estate officials to resume operations but to prohibit other in-person commercial activities—is entirely opaque. Nowhere does Executive Order 2020-77 explain the reason for its differentiation between these industries, explain why it continues to rely on superseded CISA guidance, or explain the standards to be applied by law enforcement officials when determining whether particular business operations fall within particular categories.

120.    The office of Michigan's Attorney General has acknowledged that the standards adopted in Executive Order 2020-77 are "difficult . . . to really wrap your arms around." The Attorney General's office has also indicated that it has attempted to clarify the meaning of the order with the Governor's office on an ad hoc basis. Neither the Governor nor the Attorney General has outlined the criteria under which those ad hoc determinations are evaluated.

121.    The definition of critical infrastructure workers is not just confusing for the person of ordinary intelligence—it is also confusing for the law enforcement personnel tasked with enforcing the executive order.  Law enforcement agencies have been given no explicit standards to aid in their determinations of whether businesses such as the Plaintiffs are operating in accordance with Executive Order 2020-77, which invites arbitrary and discriminatory enforcement.

122.    The continually changing FAQs found on the Governor's website do not help. The meaning of the executive order turns on its plain language, not on extra-textual or after-the-fact statements, particularly when those statements change almost daily. The FAQs cannot alter, overcome, or conflict with the plain language in Executive Order 2020-77.

123.    Further, the FAQs have morphed over time in ways that cannot be reconciled with the plain text of Executive Order 2020-77.

124.    Adding to the confusion, the State's guidance for businesses included in the Attorney General Nessel's official website continues to link to the updated CISA guidance, instead of to the March 19 CISA Guidance.  (**Exhibit 12**).  As a result, businesses seeking guidance from the Attorney General's office as to whether they perform "critical infrastructure" operations are directed to the updated CISA guidance that Executive Order 2020-77 explicitly rejects.

125.    Executive Orders 2020-17 and 2020-77 are impermissibly and unconstitutionally vague as applied to the Plaintiffs.

**Count IV – Violation of Due Process – Procedural Due Process**
**U.S. Constitution, Amendment XIV and 42 U.S.C. § 1983;**
**Michigan Constitution, Article I, § 17**

126.    Plaintiffs incorporate all preceding allegations.

127.    To the extent that Executive Order 2020-17 or 2020-77 are interpreted to bar the Plaintiffs' operations, the Executive Orders violate the Plaintiffs' procedural due process rights.

128.    Even in a pandemic, the Plaintiffs are entitled to the basic protections of due process. *See Friends of DeVito v. Wolf*, ___ A.3d ___, 2020 WL 1847100, at *19-21 (Pa. Apr. 13, 2020). "The imperative necessity for safeguarding these rights to procedural due process under the gravest of emergencies has existed throughout our constitutional history, for it is then, under the pressing exigencies of crisis, that there is the greatest temptation to dispense with fundamental constitutional guarantees which, it is feared, will inhibit governmental action." *Id.* at *19-20 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 164–65 (1963)).

129.    The fundamental requirement of procedural due process is the opportunity to be heard at a meaningful time and in a meaningful manner before one is finally deprived of a property interest.

130.    Elimination of the Provider Plaintiffs' ability to engage in business operations deprives the Provider Plaintiffs of a property interest.  As such, the Provider Plaintiffs are entitled at minimum to a post-deprivation hearing that provides them with a meaningful opportunity to challenge the designation of their businesses as non-critical infrastructure that must be shuttered in order to control the spread of the pandemic.

131.    Executive Order 2020-77 provides no process through which to challenge a business's designation as non-critical infrastructure.  Nor does it outline criteria that would serve as a reasonable guide to such a determination.  It provides no pre-deprivation or post-deprivation process at all.

132.    Executive Order 2020-17 likewise provides no procedure or process through which to challenge the determination that certain medical treatments—such as bariatric surgery or joint replacement—are non-essential.

133.    By providing no mechanism through which the Provider Plaintiffs may challenge these determinations or the necessity for shuttering their operations and by failing to identify any criteria that guide the determination of whether certain medical procedures are "essential" or constitute a threat vector for the spread of the COVID-19 pandemic, Executive Orders 2020-17 and 2020-77 violate procedural due process and must be enjoined to prevent further injury and irreparable harm to Plaintiffs.

### Count V – Violation of Due Process – Substantive Due Process
### U.S. Constitution, Amendment XIV and 42 U.S.C. § 1983;
### Michigan Constitution, Article I, § 17

134.    Plaintiffs incorporate all preceding allegations.

135.    To the extent that Executive Order 2020-17 and 2020-77 are interpreted to bar the Provider Plaintiffs' operations, they violate the Provider Plaintiffs' substantive due process rights.

136.    Two fundamental rights are implicated by Executive Order 2020-17 and 2020-77—the right to intrastate travel and the right to practice one's chosen profession. Enactments that directly curtail these fundamental rights are subject to strict scrutiny.

137.    To satisfy strict scrutiny, the government must prove that the infringement of the Provider Plaintiffs' rights is narrowly tailored to serve a compelling state interest.

138.    While the government can likely show that protection of public health in the face of a global pandemic is an important state interest, after the curve has been flattened, the

facts do not support a finding that this interest is compelling, and the government has made no attempt to narrowly tailor Executive Order 2020-17 or 2020-77 to serve that interest.

139.    Executive Order 2020-17 prohibits a variety of medical treatments that are deemed non-essential. However, there has been no showing that providing these medical treatments would increase the risk of transmission of the virus that causes COVID-19 or detract from the protection of public health.

140.    Executive Order 2020-77 specifically advises that it "must be construed broadly."  And while the Executive Order's stated purpose is to limit person-to-person contact, there has been no demonstration of why the government must prohibit all of the Provider Plaintiffs' operations—including those operations that do not require in-person contact or interaction beyond that which is necessary to provide or obtain medical treatment.

141.    Quarantine orders ordinarily require some degree of individualized analysis indicating that the particular individuals and operations quarantined pose an immediate and direct threat of contributing to the spread of an epidemic. The state has performed no analysis of whether the Provider Plaintiffs' operations pose any particular or unique threat of contributing to the spread of the virus that causes COVID-19; nor has there been any analysis of whether Provider Plaintiffs' operations are likely to contribute to the spread of the disease. Without some level of individualized assessment that determines that Provider Plaintiffs or their operations constitute a threat vector for COVID-19, the government cannot demonstrate that prohibiting their operations is narrowly tailored to achieve its public-health goals.

142.    Many of the distinctions and requirements imposed by Executive Order 2020-77 also appear to be arbitrary and unrelated to the government's public-health goals. There

has been no demonstration showing why the distinctions and requirements between various industries are necessary in order to achieve the government's public-health purposes.

143.     Moreover, Executive Order 2020-77 provides no explanation for the determination to rely upon CISA's superseded March 19 guidance but to reject the updated versions of CISA's guidance. The Executive Order does not outline or apply any criteria that guide the determination of which business operations constitute critical infrastructure; instead, the Executive Order defers to CISA's analysis as to the underlying criteria for making those determinations. Having determined that Michigan will follow CISA's assessments of which industries employ critical infrastructure workers and failing to outline its own criteria for making such determinations, there is no substantive basis for Executive Order 2020-77 to continue to rely upon guidance that CISA has specifically superseded.

144.     Because Executive Orders 2020-17 and 2020-77 impinge upon the Plaintiffs' fundamental rights and imposes arbitrary distinctions and prohibitions on the Plaintiffs' conduct, they violate substantive due process as applied to the Plaintiffs.

### Count VI – Violation of the Commerce Clause
### U.S. Constitution, Art. I, § 8, cl. 3 and 42 U.S.C. § 1983

145.     Plaintiffs incorporate all preceding allegations.

146.     To the extent that Executive Orders 2020-17 and 2020-77 are interpreted to bar the Provider Plaintiffs' operations, they violate the Commerce Clause of the United States Constitution.

147.     Because the Commerce Clause reserves to Congress the power to regulate interstate and foreign commerce, individual states may not unduly regulate commerce.

148. The Provider Plaintiffs' provision of goods and services impact the flow of interstate commerce, such that a regulation of the Provider Plaintiffs' commercial activities is a regulation that impacts interstate commerce.

149. Executive Orders 2020-17 and 2020-77 unduly burden interstate commerce in a manner that is excessive in relation to the alleged benefits of the Executive Orders. The Executive Orders impose enormous burdens on the Provider Plaintiffs' provision of goods and services by prohibiting the Provider Plaintiffs from engaging in their business operations.

150. The burden of this substantial and stringent regulation dwarfs its alleged benefits. Michigan's stated public-health goals are not advanced by prohibiting the Provider Plaintiff's operations because the Provider Plaintiffs can conduct their operations in a manner that complies with the Governor's stated goals of eliminating unsafe person-to-person contact.

151. As applied to the Plaintiffs, the Executive Orders are therefore an undue burden upon interstate commerce in violation of the Commerce Clause.

For the foregoing reasons, the Plaintiffs respectfully request that the Court enter a judgment against the Defendants and award Plaintiffs the following relief:

    a. A declaratory judgment that the Provider Plaintiffs are permitted under Executive Order 2020-17, Executive Order 2020-77, and the HHS order to continue their business operations and Mr. Gulick is permitted under Executive Order 2020-17, Executive Order 2020-77, and the HHS order to obtain knee replacement surgery and other vital medical treatment;

b. Alternatively, a declaration that Executive Order 2020-17 and Executive Order 2020-77, as applied to the Plaintiffs, violates the Michigan Constitution, the Fourteenth Amendment, and the Commerce Clause of the United States Constitution;

c. Preliminary and permanent injunctive relief preventing the Defendants from enforcing Executive Order 2020-17, Executive Order 2020-77, and the HHS order against the Plaintiffs;

d. Damages for the violation of the Plaintiffs' constitutional rights, in an amount to be proven at trial;

e. Costs and expenses of this action, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988; and

f. Any further relief that the Court deems appropriate.

MILLER JOHNSON
Co-counsel for Plaintiffs

Dated: May 12, 2020          By /s/ James R. Peterson

James R. Peterson (P43102)
Stephen J. van Stempvoort (P79828)
Amy E. Murphy (P82369)
45 Ottawa Avenue SW, Suite 1100
Grand Rapids, Michigan 49503
(616) 831-1700
petersonj@millerjohnson.com
vanstempvoorts@millerjohnson.com
murphya@millerjohnson.com


Patrick J. Wright (P54052)
Mackinac Center Legal Foundation
140 W Main St.
Midland, Michigan 48640-5156
(989) 631-0900
wright@mackinac.org

**VERIFICATION**

I, _Randal S. Baker M.D._, declare as follows:

1. I am an adult competent to testify to the matters stated herein;

2. I am the _President_ of Midwest Institute of Health, PLLC, d/b/a Grand Health Partners, and in that capacity, I am familiar with the business of Midwest Institute of Health, PLLC, d/b/a Grand Health Partners, a Plaintiff in this action;

3. I have read the foregoing Verified Complaint and, based upon my personal knowledge of the facts stated therein, the facts stated in the Verified Complaint are true to the best of my knowledge and belief.

4. If called upon to testify, I would competently testify as to the matters stated herein.

5. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

_____

_5/11/2020_                    Executed                    on:

## VERIFICATION

I, ___Jordan Warashulz___, declare as follows:

1. I am an adult competent to testify to the matters stated herein;

2. I am the ___OWNER___ of Wellston Medical Center, PLLC, and in that capacity, I am familiar with the business of Wellston Medical Center, PLLC, a Plaintiff in this action;

3. I have read the foregoing Verified Complaint and, based upon my personal knowledge of the facts stated therein, the facts stated in the Verified Complaint are true to the best of my knowledge and belief.

4. If called upon to testify, I would competently testify as to the matters stated herein.

5. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: ___5/12/20___

## **VERIFICATION**

I, _____Jordan Warashol z_____ , declare as follows:

1. I am an adult competent to testify to the matters stated herein;

2. I am the _____owner_____ of Primary Health Services, PC, and in that capacity, I am familiar with the business of Primary Health Services, PC, a Plaintiff in this action;

3. I have read the foregoing Verified Complaint and, based upon my personal knowledge of the facts stated therein, the facts stated in the Verified Complaint are true to the best of my knowledge and belief.

4. If called upon to testify, I would competently testify as to the matters stated herein.

5. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _____5/12/20_____

**VERIFICATION**

I, Jeffery Gulick, declare as follows:

1. I am an adult competent to testify to the matters stated herein;

2. I have read the foregoing Verified Complaint and, based upon my personal knowledge of the facts stated therein, the facts stated in the Verified Complaint are true to the best of my knowledge and belief.

3. If called upon to testify, I would competently testify as to the matters stated herein.

4. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on:   5/12/2020